**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STARR INDEMNITY & LIABILITY COMPANY A/S/O CESSNA AIRCRAFT COMPANY, | ) ) ) | Case No. 15-cv-6902 |
| Plaintiff, | ) ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| YRC Inc., | ) ) | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

This case concerns damage to two Jet Engines. While on loan to Cessna, the engines in question sustained damage when the truck transporting them was involved in a rollover accident. After the accident, Cessna paid nearly $2,000,000—991,674.48 and 949,756.78 for each engine respectively—for repairs to the Jet Engines. See [220 (YRC Resp. to Starr SOF) at ¶¶ 85–86.] Cessna's insurer, Starr, reimbursed Cessna for those costs. [*Id.* at ¶ 9.] Now, on behalf of its insured, Starr seeks to recoup from YRC, the trucking company-carrier responsible for the accident.

This case features the rare situation in which the defendant concedes liability,[1] so the only question for decision at this juncture is whether this Court may decide as a matter of law that YRC has limited its liability to Starr (through Cessna) for the loss or damage to the Jet Engines. YRC has moved [181, 182] for partial summary judgment, asking the Court to find as a matter of law

---

[1] "YRC acknowledges liability as an interstate motor carrier under the Carmack Amendment, leaving the only issue for the Court to decide is whether YRC could be liable for the full amount of the claimed repair costs of the jet engines or whether YRC's liability is limited to an amount less than the claimed repair costs" [182 (YRC MSJ Br.) at 1.]

that its liability is limited to $2,171, a tiny fraction of the total near $2,000,000 cost of repair. Starr has filed a cross-motion arguing that it is entitled to full recovery costs to repair the engines, plus pre-judgment interest and costs. [203, 203-1.]

Although the Carmack Amendment, 49 U.S.C. § 14706, offers carriers a narrow opportunity to limit their liability, the record is insufficient to find that YRC has carried its burden to show that any limitation of liability provision is valid as a matter of law. YRC points to limitations in two contracts—a Bill of Lading and a contract called the Schneider Transportation Schedule. However, the Bill of Lading raises a genuine question of fact over whether YRC offered Starr a "reasonable choice of liability levels." In addition, it is unclear whether Starr was on notice of those rates under a Bill of Lading prepared for the goods. Similarly, there are too many disputed facts in regard to whether YRC offered two options in the Schneider Transportation Schedule, and whether Schneider was authorized to sign on Starr's behalf. The Court therefore denies YRC's motion [181, 182.] The Court likewise denies Starr's cross-motion for summary judgment [203, 203-1], as—contrary to Starr's view—neither the Supreme Court nor the Seventh Circuit has held that carriers must offer full liability as one of the two (or more) options to create an enforceable limitation of liability provision.

The parties are directed to confer in regard to whether they wish to (a) explore settlement on their own, (b) explore settlement with the assistance of Magistrate Judge Gilbert, or (c) request a trial date. A joint status report providing the parties' views on these topics and any others is due no later than October 28, 2022.

## I.    Background

This case arises from damage to two used Jet Engines in transit from Florida to West Virginia.[2]  The details of the accident are not relevant, as YRC admits liability. See [182 (YRC MSJ Br.) at 1.]  The main issue in this case is the extent of YRC's liability, which YRC argues is confined by a limitation of liability for "used" engines set out in two contracts involving the owners of the Jet Engines, a third-party named Pratt & Whitney Canada Leasing Limited Partnership ("P&WCL").  P&WCL did not directly arrange for or actually make delivery of the Jet Engines, but rather engaged several third-party companies to arrange logistics for and execute the shipment of the Jet Engines.  To assess the validity of YRC's limitation of liability provisions, the Court first must describe the relationship of Cessna to the Jet Engines and the web of intermediaries and contractual arrangements between Cessna and YRC.  In the section that follows, the Court will set out the key provisions of the contracts between Cessna (subrogee of Starr and lender of the Jet Engines), P&WCL (the company that owned the Jet Engines), and YRC (the carrier), as well as the contracts surrounding P&WCL's shipping logistics by DHL Global Forwarding Canada ("DHL") and Schneider Transportation.

### A.    Factual Background

As noted, Cessna did not own the Jet Engines at issue in this case.[3]  Nor did Cessna arrange the shipping for the Jet Engines. Rather, the owner of the Jet Engines, P&WCL, loaned Cessna the equipment.  [220 (Starr Resp. to YRC SOF) at ¶ 7.]  The lease was governed by two Engine Lease

---

[2] The Jet Engines CG0005 and CG0717 had 2961 and 499.6 hours of use, respectively, at the time the parties entered the Engine Lease Agreements.  [220 (Starr Resp. to YRC Add. SOF) at ¶ 9.]

[3] Cessna, which manufactures and charters jets, had the Jet Engines on loan so that it could continue to fly its own planes while maintenance work was being performed on its own equipment. [220 (YRC Resp. to Starr SOF) at ¶¶ 3, 14–15.]

Agreements entered in March 2014. [*Id.* at ¶ 7; 183-6 (Ex. 6, Engine Lease Agreement – CG0005); 183-8 (Ex. 8, Engine Lease Agreement – CG0717).] Although under the agreement, Cessna "agree[d] to lease the engines" from "Pratt & Whitney Canada Leasing, Limited Partnership," P&WCL represented that it was "acting and represented herein by its general partner, Pratt & Whitney Canada Corp." (P&WC) [183-6 at 1; 183-8 at 1.] The Engine Lease Agreements allocated responsibility for liability for loss and arranging the shipment that is at the heart of this litigation.

Regarding liability, Cessna undertook responsibility for any loss or damage to the Jet Engines throughout the transportation of the engines to and from P&WCL. The Engine Lease Agreement specifically states:

> Notwithstanding P&WCL's selection of the carrier, Customer is responsible for all loss or damage to the Leased Engine, however caused, from the time of delivery to the carrier until the return to P&WCL. In such event, Customer shall promptly notify P&WCL, and Customer shall pay (i) all costs associated with the repairs to preserve the value of the Leased Engine; or (ii) the replacement value indicated on the coverage page, as P&WCL may determine it is sole discretion.

[220 at ¶ 21; 183-6; 183-8.]

Per the agreement, however, P&WCL handled the transportation arrangements.[4] [220 (Starr Resp. to YRC SOF) at ¶ 7.] Cessna agreed to adhere to P&WCL's written instructions for the return. [*Id.* at ¶¶ 18, 23] There is a dispute whether Pratt & Whitney Corporation Canada (P&WC), as distinct from P&WCL, was responsible for the delivery arrangements. [*Id.* at ¶¶ 18,

---

[4] Cessna's wholly-owned subsidiary CitationAir leased the Jet Engines. Following the parties' lead, the Court will refer to Cessna and CitationAir collectively as simply "Cessna." However, it is puzzling why Starr treats CitationAir as identical to Cessna with respect to the lease and transportation contracts while simultaneously insisting that P&WCL and P&WC are distinct entities for construing those very same contracts. [220 (Starr Resp. to YRC SOF) at 4–5 ¶ 8.] ("den[ying] that P&WC or the "P&WC Group, its affiliates and subsidiaries" are parties the Engine Lease Agreements" but acknowledging that "[t]he only parties to the Engine Lease Agreements are P&WCL and Citation Air, which was a wholly owned subsidiary of Cessna").

23.] Nevertheless, the parties do not dispute that Cessna "had no involvement in arranging for the shipment of the leased engines" and those arrangements were made "with Cessna's express agreement and understanding." [*Id.* at ¶ 24] (admitting fact to this extent). Furthermore, the Engine Lease Agreements refer specifically to P&WCL, stating in relevant part:

> P&WCL will arrange for the delivery of the Leased Engine CPT to Customer's designated facility (Incoterms 2010). Customer shall, upon termination of the Agreement, return the Leased Engine DAP (for deliveries to Canada) or DDP (for deliveries to destinations other than Canada) to P&WCL's designated facility, in accordance with P&WCL's written instructions. Customer agrees to reimburse P&WC for freight charges incurred by P&WC to transport the Leased Engine to Customer's designated facility, which charges shall be invoiced to Customer by P&WCL.

[220 at ¶ 19; 183-6; 183-8.]

Complicating matters further, P&WCL did not arrange or transport the Jet Engines but instead farmed out the delivery arrangements to a logistics provider, DHL.[5] By agreement, DHL undertook services "related to an engine movement," which encompassed "movement of P&WC Material," *i.e.*, "engines that may be made available by P&WC * * * by P&WCL or by the P&WC Group to Supplier for * * * transport under this Agreement." See [183-15 (Sealed P&WC-DHL Service Agreement) at pg. 5, ¶ 1.7, at pg. 30 (T.5, 4PL Services).] DHL also agreed to "prepare necessary shipping documents as required, *i.e.*, [Bills of Lading]" and "select carriers for ground * * * transport * * * solely from the P&WC routing guides and the carrier list as provided by the P&WC Group to the Supplier." [*Id.*] The agreement between DHL, P&WC, and P&WCL included pricing terms as well. Specifically, the contract stated that "rates to render the Services mentioned shall be" "[p]er existing UTC/P&WC carrier contract rates" for "non-local transport" delivery. See [183-15 at pg. 24.] Also relevant here, a separate document, P&WC's routing guide,

---

[5] P&WCL and P&WC entered an agreement with DHL in March/April 2010. [220 (Starr Resp. to YRC SOF) at ¶ 36; 183-15 (Sealed P&WC-DHL Service Agreement) at 2–3.]

included a company called YRC on the list of approved vendors. [183-18 (Ex. 17, P&WC Routing Instructions) at 1.]

YRC refers the Court to a separate contract executed by another company, Schneider Logistics. Although the parties vigorously dispute whether P&WC, [6] or P&WC *and* P&WCL were involved, it is clear that Schneider Logistics, Inc. entered into a contract with YRC. The ensuing contract, the "Schneider Transportation Schedule," was effective on the date of YRC's transport of the Leased Engines. [183-22 (Ex. 21, Schneider Transportation Schedule) at 52; 216 (YRC Resp. to Starr SOF) at ¶ 57.] (Admitting statement to this extent.) The Schneider Transportation Schedule lists "Schneider Logistics, Inc. ("SLI") and YRC, Inc. (SERVICE PROVIDER)" as "parties ("Parties") to the agreement. [192 (Schneider Dep.), Ex. 3 (Schneider Transportation Schedule) at pg. 142.] The Schneider Transportation Schedule was signed by "Schneider Logistics Inc." by "General Manager, Logistics Shared Services" Douglas Frank, and by "YRC, Inc." by "Authorized Representative" Clay Carpenter. See [216 at ¶ 52] (admitting fact). Furthermore, the contract defines "Customers" as: "Customer. For purposes of this Transportation Schedule, the Customer referred to in the Agreement and this Transportation Schedule shall be Pratt & Whitney Canada and/or its divisions/subsidiaries ("CUSTOMER")." [183-22 at 52.]

The Schneider Transportation Schedule imposed certain limits on liability. The relevant iteration of the Transportation Schedule reflects an amendment negotiated by Schneider and YRC in July 2014, which included changes to the liability limits for both new and used equipment. [217-

---

[6] Pratt & Whitney Corporation (P&WC) is a customer of Schneider Logistics. [192 (Schneider Dep.) at 17:3–7.] ("Q: Are you familiar with the name Pratt & Whitney Canada Corp.? A: I am. Q: What's your understanding of that Company? A: They are a customer of mine.")

2 (Ex. 30, Goodman Dep.) at 63:9–16; 65:8–25; 183-22 (Ex. 21, Schneider Transportation Schedule) at 52–54.] The amendment stated that:

> Unless otherwise agreed to in writing by both parties, SERVICE PROVIDER's liability for lost or damaged goods shall be for the original invoice value of the goods lost or damaged in the quantity shipped, whether or not lost or damaged en-route to a purchaser, however, SERVICE PROVIDER's liability shall not exceed Twenty-five U.S. Dollars ($25.00 USD) per pound per shipment, subject to a maximum of * * * One Hundred Thousand U.S. Dollars ($*** 100,000.00 USD) per shipment.

[183-22 (Ex. 21, Schneider Transportation Schedule) at 52.] The amendment further stated that:

> <u>Liability on Used Equipment or Machinery</u>: For claims purposes, value of all used machinery or equipment will be the lesser of Fifty Cents ($0.50 USD) per pound or the current depreciated value on date of shipment, subject to a maximum liability of Twenty Thousand U.S. Dollars ($20,000.00 USD) per shipment. SERVICE PROVIDER shall otherwise provide liability for a "mixed load" containing both used machinery and other commodities subject to a maximum of *** One Hundred Thousand U.S. Dollars ($***100,000.00 USD).

[183-22 (Ex. 21, Schneider Transportation Schedule) at 53.] According to the contract, the amendment was effective as of July 9, 2014, and amends the Pratt & Whitney Canada Transportation Schedule dated July 1, 2009 ("Agreement"), between SERVICE PROVIDER and SLI." [183-22 at 52.] However, also relevant in hindsight, one additional limitation of liability was featured in the contract. The contract provides different rates for "LTL—Less than Truckload" shipments which appear equally applicable to the case. Per the agreement, "effective April 2, 2007," "NMFC Item 120800 is to be rated at FAK 60," and under the "FAK Structure" shipments for class "150+" are billed for "actual." [183-22 at 16.]

Although the Schneider Transportation Schedule incorporates an original agreement dating back to 1995,[7] the iteration at issue in this case is the byproduct of negotiations from 2009. As

---

[7] The Transportation Scheduled "hereby incorporated by reference into this Transportation Schedule so as to comprise a separate and enforceable contract between the parties" an earlier-negotiated contract called the Master Transportation Services Agreement (the MTSA), which was effective May 31, 1995 and was

noted, the parties dispute who is a "customer" to that agreement, but Schneider negotiated the contract with YRC on behalf of, at a minimum, P&WC. [236 (Starr Resp. to YRC Add. SOF) at pg. 1, ¶ 1] ("In or about July of 2009, Schneider Logistics began negotiation of a Transportation Schedule between P&WC and YRC"); See also [216 (YRC Resp. to Starr SOF) at ¶ 57] (admitting statement to this extent).

The parties also dispute the extent to which the contract was the byproduct of a "negotiation" or whether "YRC dictated the liability term it would agree to and Schneider had no authority to negotiate it." [236 (Starr Resp. to YRC Add. SOF) at ¶ 4.] There is no testimony specifically regarding the negotiation for this specific Transportation Schedule. However, YRC testified that its contracts might be the product of a "back-and-forth" and exchange of information between YRC and its customers regarding freight rates, other charges, and limitations of liability to see if an agreement can be reached. [*Id.* at 6–7, ¶ 4.] Furthermore, at the very least, it appears that YRC proposed the rates based on information about the commodity furnished by Schneider.[8] [*Id.* at ¶ 57.] It also appears that the contract was Schneider Logistics' template agreement that was presented to YRC. [236 (Starr Resp. to YRC Add. SOF) at ¶ 1; 217-2 (Goodman Dep.) at

---

entered into between Schneider Logistics and a company that is now "part of YRC by merger." [216 (YRC Resp. to Starr SOF) at 32–33, ¶ 57.]

[8] [217-2 (Ex. 31, Carpenter Dep.) at 16:1–19:11] (testifying "Q: So in terms of – you would receive the information from Schneider purporting to be what the customer might need in terms of transportation services. Then you'd go back and look at the information, come up with, *** a scale of charges, rates, and then give it back to Schneider. *** And then, I gather, they come back to you with maybe changes or suggestions; is that correct? A: There could be back-and-forth negotiations that go on between YRC and Schneider on the level of pricing that YRC would need to provide to be able to handle those shipments for the client. Q: *** So after this back-and-forth *** ultimately, YRC will say, Okay, these are the rates; is that correct? A: uh-huh. Q: And that will be told to Schneider—A: Correct"). See [186-1 (Carpenter Dep.) at 23:20–24:1] (YRC testifying that "[w]e have language that we prefer to utilize in our contracts that deal with limitations of liability. And when we're negotiating contracts, we will try to have that language be what is contained in the sections regarding liability, cargo claim").

47:1–6] (Q: This is your contract, isn't it? This is your template? A: It is. Q: So you put in the words. You, meaning Schneider, put in the words excess liability coverage, correct? A: I did.")

Finally, the Court turns to the delivery that resulted in the damage to the Jet Engines. In 2014, Cessna contacted DHL to return the Jet Engines, and with P&WCL's authorization, DHL arranged the shipment in 2014. [183-11 (Minutelli Dep.) at 35:6–7.] James Minutelli worked on behalf of P&WCL to arrange transportation for the Jet Engines. [220 (Starr Resp. to YRC) at ¶¶ 30, 31].[9] Although Minutelli is a DHL employee, he is contracted "through DHL," which appears to mean he works on P&WCL's behalf. [183-11 at 17:11–18:4.] On August 12, 2014, Minutelli set the ball in motion, completing an "engine movement form" and emailing the form to the third- party logistics company DHL. [*Id.* at 34:13–21; 41:22–42:1; 220 at ¶ 34.] The form contained "an authorization for * * * third-party logistics provider" DHL "to arrange for the transportation." [183-11 at 24:5–20; 34:7–12.]

Upon receipt of the engine movement forms, DHL prepared a bill of lading. See [183-2 (Ex. 1, Bill of Lading); 183-12 (Ex. 11, Minutelli Email).] DHL employee Evelina Kekevska emailed the bill of lading to Minutelli, copying Cessna representatives and Pratt & Whitney. See [183-12 (Ex. 11, Minutelli Email) at 2; 183-11 (Minutelli Dep.) at 34:22–35:12; 38:24–39:2.] The Bill of Lading designated YRC as the carrier to transport the Jet Engines at issue in this case. [183-2 at 1.] The description on the Bill of Lading "for the Leased Engines was 'AIRCRAFT

---

[9] See [183-11 (Minutelli Dep.) at 10:2–8; 11:6–8, 12:1–7] ("I do logistics management * * * in asset management for Pratt & Whitney Leasing" and when asked to specify "the full name" he stated "My understanding is Pratt & Whitney Canada Leasing Limited Partnership;" (P&WCL) despite that other witnesses referred to "this entity as Leaseco" he stated "Leaseco is internally what we call Pratt & Whitney Canada Leasing, LP"). Although Minutelli is technically a DHL employee, he was contracted through DHL as a Logistics Coordination Specialist. [220 (Starr Resp. to YRC) at ¶¶ 30, 33.] DHL was used as a "third-party logistics provider to arrange for the transportation of jet engines * * * including the return of jet engines off lease." [*Id.* at ¶ 33.]

ENGINES' bearing the following serial numbers for each engine: CG0717 and CG0005" and "the weight of Jet Engine received by YRC was 2171 pounds," with total dimensions "Length 92 inches, Width 55 inches and Height 60 inches." [*Id.*; 216 (YRC Resp. to Starr SOF) at ¶ 38] (admitting fact); [186-1 (Carpenter Dep.) at Ex. 1 to Carpenter Deposition.]

Several provisions of the Bill of Lading are relevant. The Bill of Lading states that the shipment is, "[r]received subject to individually determined rates or written contracts that have been agreed on in writing between the carrier and the shipper, if applicable, otherwise to rates, classifications and rules that have been established by the carrier and are available to the shipper on request." [183-2 (YRC Bill of Lading).] The Bill of Lading further states: "(1) Where the rate depends on value, shippers must state specifically in writing the agreed or declared value of the property as follows: The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per ____." [*Id.*] The document further states "Note: (2) Liability limitation for loss or damage on this shipment may be applicable. Sec 49 U.S.C. § 14706 (c)(1)(A) and (B)." [*Id.*] No value was ever filled in the blank space for declaring the property value. [*Id.*]

The Bill of Lading also lists the "NMFC Item number" for "Aircraft Engines CG0717" and "CG0005" is "12080004," "Class 85." [183-2 (YRC Bill of Lading).] The parties dispute what role an NMFC classification plays in the shipment rates. Relying on testimony from YRC's corporate representative, Starr asserts that "YRC relies upon the NMFC and other information provided on bills of lading to rate shipments" [216 (YRC Resp. to Starr SOF) at pg. 18, ¶ 42.] See *id.* (YRC admits "that for certain shipments YRC may use the NMFC and information provided on a bill of lading to determine the freight rates." (citing ASOF ¶ 13; Carpenter Dep. 33:17–24, 34:1n. 1–21)). [10]

[10] The parties also dispute whether YRC would apply the NMFC Item Number listed on the bill of lading in the case of a mismatch between the number and goods at issue. YRC testified that in general, as a rate auditor, if there was an inconsistency between the NMFC and the information on the bill of lading then it

On or about August 13, 2014, Cessna tendered the two Jet Engines to YRC for transportation from Orlando, Florida to Bridgeport, West Virginia. [216 (YRC Resp. to Starr SOF) at ¶ 28.] YRC signed the Bill of Lading at the time its pick-up driver received the Leased Engines at Cessna's facility. [*Id.* at ¶ 16; Ex. 26 (Blalock Dep.) at 24:2–5.] Cessna signed the Bill of Lading in the prompt designated for the "Shipper," and YRC signed as the "carrier." [216 at ¶ 27; 186-1 (Carpenter Dep.) at 29:18–24; 30:1–14.] "The consignee identified on the BOL was 'KCL c/o P&WCL,'" with the location 2500 E. Benedum Dr., Bridgeport, West Virginia 26300, the location where P&WCL engines are shipped and received by KCL on P&WCL's behalf. [216 at ¶ 16.][11]

---

might result in application of a different NMFC Item Number. Starr contends that YRC relies on the NMFC "unless" there is no "inconsistency between the description of the freight on the BOL and the NMFC Item number shown." [216 (YRC Resp. to Starr SOF) at pg. 18, ¶ 42.] This statement is not supported by the record. YRC testified only to experience as a rate auditor, specifically that the rate auditor corrected the classification number, on occasion. The corporate representative did not testify that YRC as a matter of policy would apply a different number every time a mismatch occurred. Specifically, the representative testified as follows:

> Q: In your experience as a freight rate auditor, did you ever have occasion to apply other national motor freight classification sections that seemed more applicable than the one you might see on the face of the bill of lading?
>
> [Carpenter A]: Did I on occasion? Yes.
>
> Q: Okay. And why would you do that? What circumstances would you do that?
>
> [Carpenter A]: As a rate auditor?
>
> Q: Yes.                                               (Footnote continues on next page . . .)
>
> [Carpenter A]: If there is a distinct difference between the bill of lading and the NMFC item number on the bill of lading.

See [186-1 (Carpenter Dep.) at 34:22–35:10.]

[11] Starr cites Minutelli's Deposition [187-1 at 18:20-24] for the proposition that P&WCL engines are shipped and received at the location on P&WCL's behalf, but Minutelli stated as follows: "MX KCI Aviation is the destination, that's our maintenance facility and also the shipping at KCI Aviation is the same, is the people that would receive the engine at the destination." [*Id.*]

As noted above, the Jet Engines were ultimately damaged when the YRC truck driver was involved in a rollover accident en route to the West Virginia destination. Both Jet Engines were repaired, and, per its agreement, Cessna footed the bill. Cessna then submitted a claim on its policy from its insurer, Starr, and Starr was compelled to pay its insured, Cessna, the sum of $1,916,413.26.

**B. Procedural Posture**

As subrogee of Cessna Aircraft Company, Plaintiff Starr Indemnity & Liability Company brings claims against Defendant YRC, Inc. for the Jet Engine damage that Cessna had tendered to YRC for interstate over-ground transportation. [126] (citing [123, ¶¶ 1, 4, 6.])

At this juncture, the one remaining claim in this suit arises under the Carmack Amendment, 49 U.S.C. § 14706. Specifically, Starr alleges liability against YRC for damage to the cargo, as well as prejudgment and post-judgment interest, under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706. The Third Amended Complaint seeks a seven-figure payout, but YRC argues that its liability is contractually limited to $2,171. [*Id.* at 6]; [101 at 6.]

The Court previously granted in part Plaintiff's motion for judgment on the pleadings [118], construed as a motion to strike certain of YRC's affirmative defenses [126.] However, critical here, YRC still maintains an affirmative defense. As the Court understands YRC's affirmative defenses [123], YRC asserts that its liability, if any, to Starr is limited by one of two contracts. Primarily, YRC asserts that its total liability is $2,170—*i.e.*, fifty cents per pound for 4,340 lbs.—per the terms of a contract called the Schneider Transportation Schedule. Alternatively, YRC asserts that its liability is limited to an amount set by YRC's Tariff, incorporated by reference into the Bill of Lading.

---

On first blush, the deposition transcript cited does not align with the facts asserted. Nevertheless, YRC has deemed this fact admitted, thus the Court will not consider the issue further.

The parties have moved for summary judgment under Federal Rule of Civil Procedure 56. YRC contends that there is no genuine issue of material fact concerning the limitation of YRC's liability to $2,171 and thus seeks "partial" summary judgment on those grounds. See [181 (Def. YRC Inc.'s Mot. for Partial Summ. J. ("YRC Mot. Summ. J.")); 182 (Def. YRC Inc.'s Mem. of Law in Support of its Mot. for Partial Summ. J. ("YRC MSJ Br.")); 231 (YRC Inc.'s Reply in Support of its Mot. for Partial Summ. J. ("YRC MSJ Reply")).] Starr opposed YRC's motion in full. [219 (Pl.'s Mem. of Law in Opp. To Def.'s Mot. for Partial Summ. J. ("Starr Opp. to YRC MSJ")).]

In its cross-motion for summary judgment [203, 203-1 (Preliminary Statement ("Starr MSJ Br.")), 235 (Corrected Pl. Starr Indemnity & Liability Co.'s Reply Memorandum of Law in Opposition to Def.'s Response to Starr's Mot. for Partial Summ. J. ("Starr MSJ Reply"))], Starr asks the Court to "deny[] YRC's asserted affirmative defenses [123] limiting its liability and grant[] Starr full recovery costs to repair the engines, plus pre-judgment interest and costs." [203-1 (Starr MSJ Br.) at 1.] Unsurprisingly, YRC opposes Starr's motion in full, and incorporates by reference its own motion for partial summary judgment into its opposition to Starr's requests. [215 (Def. YRC Inc.'s Resp. in Opposition to Pl.'s Mot. for Partial Summ. J. ("YRC Opp. to Starr MSJ")).]

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of

demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). As noted above, in evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). Finally, "where (as here) cross-motions for summary judgment are involved, those principles require the adoption of a Janus-like perspective: As to each motion, the nonmovant's version of any disputed facts must be credited." *Orthodontic Centers of Illinois, Ltd. v. Michaels*, 461 F. Supp. 2d 655, 657 (N.D. Ill. 2006).

### III.    Analysis

Starr and YRC both move for summary judgment on YRC's affirmative defense that it has limited its liability under the terms of its contract with P&WCL, the real "shipper" of the goods. YRC says its liability is capped at $2,171—*i.e.*, $ 0.50 per 4,342 pounds—as a matter of law. [182 (YRC MSJ).] In addition to opposing YRC's motion, [219], Starr filed a cross-motion for summary judgment. Starr seeks summary judgment "denying YRC's asserted affirmative defenses [123] limiting its liability. [203-1 at 1.]

The gist of YRC's motion and supporting brief [181, 182] is that YRC has a valid and enforceable limitation of liability in one of two contracts formed between YRC and P&WCL. In opposition, Starr contends and cross-moves for a declaration that YRC has no enforceable

14

limitation of liability under the Carmack Amendment and so both of YRC's affirmative defenses fail as a matter of law. Starr then goes a step further, arguing that because YRC's limitations of liability are invalid, Starr is entitled, as a matter of law, to "full recovery of the costs to repair the engines, plus pre-judgment interest and costs" [203-1 (Starr MSJ Br.) at 1.] Thus, together the parties' motions boil down to the premise that the Court may grant (as YRC requests) or deny (as Starr requests) YRC's affirmative defenses.[12]

"The Carmack Amendment provides that a carrier of property in interstate commerce is liable for 'the actual loss or injury to the property caused by' the carrier." *Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, 687 F.3d 780, 781 (7th Cir. 2012) (quoting 49 U.S.C. § 14706(a)(1)). Even so, "[a] carrier may limit its liability * * * 'to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.'" *Id.* (quoting § 14706(c)(1)(A)).

Courts apply "a four-step test" to determine whether a carrier has properly limited its liability under the Carmack Amendment. That test, set out by the Seventh Circuit in *Hughes v.*

---

[12] The Court has reviewed both parties' motions for summary judgment concerning YRC's purported limitation of liability set forth in YRC's motion for summary judgment and Starr's cross-motion for partial summary judgment. However, for simplicity and ease, the Court has done the best it could to streamline those arguments and will cite primarily the papers in Starr's motion for cross-summary judgment and, above, relied on the corresponding Rule 56.1 Statements of Fact. [210 (Starr SOF), 216 (YRC Resp. to Starr SOF), 217 (YRC Add. SOF), 236 (Starr Resp. to YRC Add. SOF).]

The Court has chosen to draw primarily on the briefing on Starr's affirmative motion because it appears that Starr's opening brief [203-1] drives most directly at the heart of the issue and that it largely mirrors its opposition brief to YRC's motion for summary judgment [219.] It likewise appears that YRC's opposition brief to Starr's motion for summary judgment [215] largely mirrors its reply brief in support of summary judgment [231.] See [215 (YRC Opp. to Starr MSJ) at 2 n.1] (incorporating "all of its arguments supporting its limitation of liability set forth" in [181, 182] by reference). Where necessary, the Court has supplemented from YRC's motion for summary judgment, in particular its reply in support, and the parties' corresponding Rule 56.1 statements.

*United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir.1987), is "widely-accepted." *Nipponkoa*, 687

F.3d at 782. As the Seventh Circuit recently reiterated:

> A carrier must take the following four steps to limit its liability under the Carmack
> Amendment: (1) maintain a tariff within the prescribed guidelines of the Interstate
> Commerce Commission [ICC]; (2) obtain the shipper's agreement as to a choice of
> liability; (3) give the shipper a reasonable opportunity to choose between two or
> more levels of liability; and (4) issue a receipt or bill of lading prior to moving the
> shipment. if that value would be reasonable under the circumstances surrounding
> the transportation.

*Id.* (quoting *Hughes*, 829 F.2d at 1415–16). However, "[f]ollowing the enactment of the Trucking

Industry Regulatory Reform Act of 1994 and the ICC Termination Act of 1995, the first part of

the *Hughes* test is no longer applicable." *Id.*

Also relevant here, a carrier may enter contracts of limitation through intermediaries. The

Supreme Court held in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004), that "[w]hen an

intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the

carrier is limited by the liability limitation to which the intermediary and carrier agreed" even

when the "traditional indicia of agency" are absent. *Id.* at 33–34. In other words, "[t]he idea is

that if A engages B to handle a shipment, among other things, A has delegated to B the choice

between a lower price with a strict limitation of liability and a higher price without one, when B

engages the services of Carrier C." *Nipponkoa*, 687 F.3d at 784.

Section 14706(c)(1)(A) thus allows carriers to limit liability in some circumstances. YRC

contends that there is no genuine issue of fact to preclude a finding that YRC has satisfied the

Carmack Amendment's limited exception such that the Court may find that YRC limited its

liability to $.50 per pound. According to YRC, the Schneider Transportation Schedule,

incorporated by reference into the Bill of Lading prepared by DHL on P&WCL's behalf, includes

a limitation of liability that is valid under the Carmack Amendment [182 (YRC MSJ Br.) at 10.]

Alternatively, YRC contends that the Bill of Lading signed by YRC, Cessna, and consignee

16

P&WCL on the date Cessna tendered the Jet Engines to YRC also contains a valid limitation of liability. [182 at 11; 215 (YRC Opp. to Starr MSJ) at 10.]

Starr disagrees, arguing that YRC cannot carry its burden under the *Hughes* test to show that the limitations of liability in either document are valid and enforceable. In opposition to YRC's request for summary judgment, and in its own cross-motion for partial summary judgment, Starr asserts that any purported limitation of liability within the Bill of Lading, such as the YRC Tariff or the Schneider Transportation Schedule, is inconsistent with the Carmack Amendment. As best this Court can ascertain, Starr asserts that YRC has "consciously ignored its duty to offer full liability to P&WC, P&WCL or CESSNA." [203-1 (Starr MSJ Br.) at 11; 219 (Starr Opp. to YRC MSJ) at 10]. According to Starr, "unless motor carriers offer full liability, they are not entitled to limit their liability below the default posture of full liability under the Carmack Amendment." [203-1 at 12.] Relatedly, failing that, Starr argues in its reply brief [235 at 12–21]—and (albeit implicitly) in its opposition brief [219 at 6]—that even if YRC was not required to offer the actual value of the Jet Engines, its limitation of liability is still invalid because YRC did not offer a choice of liability levels. See [235 at 12–21; 219 at 6.] Starr also contends that YRC cannot carry its burden to fulfill another Carmack Amendment requirement—namely, that the limitation of liability is "reasonable under the circumstances surrounding the transportation," see 49 U.S.C. § 14706(c)(1)(A) [203-1 at 16; 219 at 32.] Starr further resists enforcement of the limitation of liability on the basis that Cessna did not waive its "rights and remedies under" 49 U.S.C. § 14101(b)(1) because it did not agree expressly and in writing waive its right to full liability under the Carmack Amendment. [203-1 at 20–22; 219 at 16.]

Starr argues that the second contract, the Bill of Lading, contains a provision that the shipment was NMFC Classification Item 120804, Class 85 and "of no effect." It insists instead

that NMFC No. 120800, Class 150 applies such that YRC is liable for the shipment's actual value. [203-1 at 24; 219 at 22].  Turning to the Schneider Transportation Schedule, Starr maintains that neither the owners of the shipment, P&WCL, nor CESSNA are bound by the Transportation Schedule because "there was no privity of contract between them and YRC."  [203-1 (Starr MSJ Br.) at 25; 219 (Starr Opp. to YRC MSJ) at 21.]  As a final backstop, Starr asserts that YRC materially deviated from the contract and thus nullified its limitation of liability.  [203-1 at 34.]

After working through all of these permutations, the Court denies both motions for summary judgment. In Part A,[13] the Court will explain why the Court cannot say as a matter of law that the Bill of Lading offered the shipper a choice of liability levels as required by the Carmack Amendment.  Even assuming it did, it is not undisputed that YRC put the shipper on actual notice of the shipping terms.  Then, in Part B, the Court will explain why a genuine dispute of fact precludes finding that YRC's other purported contract with P&WCL, the Schneider Transportation Schedule, contained a limitation of liability that was *also* incorporated into the Bill of Lading.  The Court also is not convinced that YRC offered a choice of liability rates under the Schneider Transportation Schedule.  Even then, the Court cannot say decisively which rate applies to the shipment, or that P&WCL was bound by the rates set out in the Schneider Transportation Schedule.  Finally, in Part C, the Court will explain why Starr's remaining arguments in support of its motion for summary judgment also fail because Starr has not shown that YRC was required to offer full liability under the Carmack Amendment under Seventh Circuit law.

---

[13] Although the Court acknowledges that YRC presents the Schneider Transportation Schedule as the primary reason that it has limited its liability to P&WCL and Cessna, the Court begins with the Bill of Lading because YRC's argument assumes that the Schneider Transportation Schedule is incorporated by reference into the Bill of Lading.  Thus, it makes intuitive sense to evaluate whether the Court can rule as a matter of law that the Schneider Transportation Schedule is incorporated into the Bill of Lading.

### A. Bill of Lading

As noted above, YRC argues that it "has clearly satisfied the *Hughes* test and is entitled to limit[] its liability under the Carmack Amendment" [215 (YRC Opp. to Starr MSJ) at 9.] The first step of the *Hughes* test has not survived amendment to the statute, and the parties do not appear to dispute steps two and four of the *Hughes* test. Thus, the decisive issue is whether YRC's limitation of liability in the Bill of Lading and the Schneider Transportation Schedule satisfies the third step of the *Hughes* test. See *Hughes*, 829 F.2d at 1415–16 (whether the carrier gave "the shipper a reasonable opportunity to choose between two or more levels of liability"). Specifically, YRC asserts that it satisfied the third step of the *Hughes* test because "Cessna was given a choice of liability between declared value and the levels or level of liability set forth in the YRC tariff," [182 (YRC MSJ Br.) at 15; 215 (YRC Opp. to Starr MSJ) at 11.] See also [*id.* at 14] ("We turn to YRC's tariff and the Transportation Schedule as to levels of liability that were afforded to Cessna/Pratt & Whitney"). Starr opposes on several bases, among them that neither Starr nor Cessna expressly waived its limitation of liability nor received an opportunity to choose between liability levels.

### 1. *Hughes* Step 3: Choice of Liability Levels

Although the Seventh Circuit has not had many occasions to weigh in on the third prong of the *Hughes* test, its guidance in *Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, 687 F.3d 780 (7th Cir. 2012), is instructive because it addresses the third step of the *Hughes* inquiry and does so in the context of intermediaries.

*Nipponkoa* involved a dispute over the extent to which a carrier, a trucking company, was liable for the damage it caused to the goods of a shipper, a medical device company. 687 F.3d at 781. The shipper's insurer filed suit against the carrier, seeking to recoup the full value of the

damaged goods, but the defendant-carrier argued that it limited its liability to the insurer (through the carrier) through two contracts. *Id.* at 781–83.

The first, a contract formed between an affiliate of the shipper and the carrier stated that "[s]hipper acknowledges that the Tariff includes a choice of liability options" and "[u]nless Shipper specifically requests different provisions with respect to any single shipment, Shipper releases all shipments transported under this Contract to Carrier with its maximum liability to be $0.60 per pound under Item 190 of the [t]ariff." *Nipponkoa*, 687 F.3d at 782. The tariff, in relevant part, stated that "[r]ates apply on shipments released to a value not to exceed 60 cents per pound, per article. When shipment is released to a value exceeding 60 cents per pound, per article, or shipper declares a valuation on the entire shipment, rates herein apply plus charges in Item 190." *Id.* at 783. In turn, tariff Item 190 specified that "when a shipment is released to a value exceeding the maximum liability (in this case, presumably $0.60 per pound), [the carrier] will obtain third-party insurance" and charge the shipper "for the cost of coverage' $4.50 per $1,000 for the total value declared." *Id.* No evidence presently in the record "clarifie[d] whether the reference to a price of $4.50 per $1,000 of value declared is supposed to incorporate both an additional rate and insurance, or if it is exclusively the price of insurance," *id.* at 783.

The second contract that purportedly limited the trucking company's liability was a bill of lading, which "[s]tate[d] that the shipper has released the shipment to a value not exceeding either '[t]he maximum released rate set forth in the tariff for shipments on which the specified services are being provided, which may be either $.60 per pound per article or $5.00 per pound' or '[t]he declared value for the property of $_____.'" *Id.* at 782. The shipper's affiliate, hired to coordinate the shipment, *id.* at 781, signed the bill of lading, but left blank the "declared value," *id.* at 782–83.

The Seventh Circuit considered whether the carrier-defendant "limited its liability to" the medical device company "consistently with the Carmack Amendment," *Nipponkoa*, 687 F.3d at 782, and more specifically the third step of the *Hughes* test, whether the carrier had "give[n] the shipper a reasonable opportunity to choose between two or more levels of liability," *id.* at 781. Although the contracts between the affiliate and trucking company "[o]n their face * * * suggest[ed] that [the medical device company] had a choice between accepting a $0.60 per pound limitation of liability or declaring a different value for the load, while also incorporating [the trucking company's] tariff," the court of appeals could not say as a matter of law that either contract offered the medical device company a choice of liability. Rejecting the carrier's argument that the tariff offered an option for value in excess of $.60 per pound and reversing the district court, the court found disputed issues of fact regarding whether the purported "second option" (the shipper declaring a value for which it would be charged for third-party insurance) was in fact a "second option for a rate" or "merely" set out "the cost of insurance." *Id.* at 783–84. And that disputed issue left open the question of whether the trucking company offered the medical device company "a reasonable opportunity to choose between two or more levels of liability." *Id.* at 784.

The court also gave a second reason why summary judgment for the defendant was improper: the court could not determine as a matter of law that the third-parties who agreed to the limitations of liability in the contract and bill of lading were intermediaries authorized to "sign shipment contracts on [the shipper's] behalf." *Nipponkoa*, 687 F.3d at 784. As for the contract setting the terms and rates, the carrier argued that the contract, which was executed by an affiliate called ACS, not the shipper, "was automatically triggered when [the shipper] tendered [its] load to [the carrier]." *Id.* at 784. In contrast, the shipper characterized the third party as "merely" the carrier's "invoicing agent," not an intermediary, pointing to the fact that the third party was "not

registered as a freight broker" as required under statute, and testimony suggested that the third party merely took "care of [another third party's] invoicing." *Id.* at 784.

Acknowledging that the Supreme Court blessed the enforcement of limitations of liability signed by intermediaries, the Seventh Circuit concluded that "[t]he facts pertaining to [the third party who signed the contract's] role—in particular whether it was functioning as the kind of intermediary to which the Supreme Court was referring in *Kirby*—[we]re murky at best." *Id.* As for the bill of lading, the court similarly reasoned that there were "competing facts in the record": the shipper hired the third party to coordinate shipments but "did not work exclusively with [the carrier] for all shipments," as the third party would turn to other carriers when different types of shipment were required. On the other hand, personnel testified that the third-party "has an agency agreement with [the carrier]" and that the carrier is the third party's "exclusive motor carrier." Nevertheless, it was "impossible to conclude as a matter of law" that the third party was an intermediary under the Supreme Court's definition.

Here, too, the Court cannot say that as a matter of law that YRC's Bill of Lading, by way of YRC's Tariff, provided the shipper with a choice of rates. YRC contends that the blank space on the Bill of Lading and the reference to YRC's applicable tariffs offered the shipper a choice of rates, and the shipper failed to fill in a declared value. Specifically, the Bill of Lading stated the goods were tendered "subject to individually determined rates *** otherwise to rates, classifications and rules that have been established by the carrier" together with a blank space to declare the value of the goods. [182 (YRC MSJ Br.) at 16.] According to YRC, "[b]y leaving blank the space for declaring a value, and signing the bill of lading, Cessna made a choice and formed a contract to be bound by the rates, classifications, and rules of YRC which were available upon request, as well as online." [215 (YRC Opp. to Starr MSJ) at 11.]

The Court is not convinced that it can conclude on this record that the Bill of Lading's reference to terms and conditions, coupled with the blank space, constituted a choice of options. In fact, the effort to unpack the Tariff reveals a mess. For its part, YRC asserts that "Tariff 100," YRC's Rules Tariff, was in effect on the date of shipment. [215 at 14.] YRC then directs the Court to Item 780 which provides in pertinent part for used commodities:

> USED COMMODITIES – in lieu of the valuation indicated in the NMFC valuation, rates and charges on USED or RECONDITIONED articles (as defined in Tariff 100, Item 110) will be as follows:
>
> When Consignor or Consignee declare no value or declares an actual or released value of 50 cents or less per pound per package or fails to describe the articles as used or reconditioned on the original Bill of Lading:
>
> Apply 100 percent of the Customer's otherwise applicable charges as published in tariffs subject to this item.
>
> Carrier's maximum liability shall not exceed 50 cents per pound per package or $10,000 per incident, whichever is lower.

See also [*id.* at 16] ("Those 'rates, classifications, and rules' were/are YRC's individual Tariff 100, Item 780"); [186-6 (Blaylock Decl.) at Ex. A (Tariff 100).] This appears to offer the shipper a single rate, as it is unclear what happens if the shipper does in fact declare a value.

Nor is the Court convinced by YRC's argument, buried in a footnote, that the "excess valuation" under Item 780 "provide[d] another level of liability on a per pound basis" that the shipper could have elected to take by declaring a value on the Bill of Lading. Aside from the opacity of Item Number 780, it is not clear that the shipper could have changed its rate even if it declared an amount: at 2,171 pounds for the two Jet Engines, the shipper would have run up against the same $10,000 maximum rate of liability regardless of whether it filled in the blank.

Having taken stock of these terms, just as in *Nipponkoa*, the Court is unconvinced that the Bill of Lading's vague reference to the Tariff constitutes a choice of options as a matter of law:

any clarity about the applicability of the Tariff "slip[s] away when [the Court] look[s] to the tariff, which is an ambiguous mess." 687 F.3d at 783 (declining to find that a bill of lading which "stat[ed] that the shipper has released the shipment to a value not exceeding the *** rate set forth in the tariff" where any choice of liability through the tariff "slip[s] away when we look to the tariff, which is an ambiguous mess"). Nor did it change the equation in *Nipponkoa* that the shipper had an option to fill in a blank space for "declared value." See *id.*

YRC cannot rescue its position by relying on *Hisense*, 2015 WL 4692460 (N.D. Ill. Aug. 6, 2015). In fact, *Hisense* undercuts YRC's case because there the district court found it could *not* enforce a limitation of liability as a matter of law. Perhaps recognizing that *Hisense* denied summary judgment for the carrier-defendant, YRC argues by way of distinction. Namely, YRC argues that the Bill of Lading in this case has the missing ingredients that precluded judgment in *Hisense*: an express limitation of liability provision, and a blank space to declare value. 2015 WL 4692460, at *5. But *Nipponkoa*, which binds this Court, suggests that merely giving a shipper an option to "fill-in-the-blank" together with a vague reference to the carrier's tariff is not sufficient to show a shipper received options for liability rates as a matter of law. What's more, as in *Hisense*, without reference to a specific YRC Tariff and Tariff Number in the Bill of Lading, neither the shipper nor the nominal shipper would have any "knowledge of the varying rates and liability limitations contained in the tariff" for which the shipper could have filled in, and therefore this does not constitute "notice" under *Tempel*. See *Hisense USA Corp*, 2015 WL 4692460, at *5.

### 2. Actual Notice

Putting aside YRC's failure to offer a choice of rates, YRC cannot show as a matter of law that the shipper had "actual notice" of its rights for purposes of the *Hughes* test. "[I]t has long been established * * * that actual notice is necessary for a limitation of liability to be enforced."

*Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000). "Constructive notice" does not suffice even for sophisticated parties, as "language in the statute (or any regulation we could find) requires businesses to scrounge for limitations that have not been flagged by the carrier." *Id.* at 1031. A limitation provision "bind[s] the shipper * * * only if the shipper has notice of the rate structure and is given a full and fair opportunity to obtain greater protection." *Co-Operative Shippers, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 840 F.2d 447, 449 (7th Cir. 1988).

A pair of cases help flesh out the meaning of actual notice. It appears that where the parties negotiate and enter a contract imposing liability limits on the carrier, the shipper has actual notice of the limitation on liability. In *Co-Operative Shippers*, a rail carrier sought to limit its liability to a shipper for damage to goods in transit based on a limitation of liability in the parties' transportation contract, 840 F.2d at 451, which was negotiated by the shipper's management company, *id.* at 449. Although the parties negotiated certain other provisions of the contract, the management company never sought to negotiate the liability terms. *Id.* at 449. The carrier maintained a tariff at the time of the negotiations, which was incorporated into the contract by reference, and the shipper had received a copy of those tariffs prior to execution of the contract, *id.* Nevertheless, none of the employees of the management company nor shipper considered the liability or released value terms therein. *Id.* at 450–51.

The Seventh Circuit reversed the district court's grant of summary judgment to the shipper for the actual value of the damaged goods and denial of summary judgment for the carrier. *Co-Operative Shippers, Inc.*, 840 F.2d at 451. The court of appeals reasoned that the shipper had actual notice of the liability limitation: the shipper "made a well informed, deliberate and absolute choice" to limit its liability, not a decision "by mere implication." *Id.* at 451. The limitation in the

25

contract "was negotiated between parties of at least equal commercial awareness" and the shipper and its management "personnel had ample opportunity to read [the contract] and [the tariff provisions] before the transportation agreement was executed." *Id.* at 452. The shipper "offered Co–Op an alternative term, released value liability" and the shipper "still had a full and fair opportunity to receive section 11707 full actual value liability terms pursuant to Item 57 of TOFC–1 and Item 1017 of Circular 7000" *Id.* at 452. It did not change the equation that the shipper and its "management personnel more or less skipped over the liability provisions." *Id.*[14]

In *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000), by contrast, the court determined that carriers cannot simply gesture broadly to a tariff to give the shipper "actual notice." There, a shipper sought to recover repair costs from its carrier. *Id.* at 1029. The carrier insisted that it had disclaimed all liability because the bill of lading issued for the shipment stated that the goods were "received 'subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.'" *Id.* at 1030. In turn, the alleged tariff (or in laymen's terms, the carrier's "standard terms") was a document maintained in the carrier's files that stated that "at no time shall Carrier be held liable for any loss or damage to a shipment within the country of Mexico." *Id.*

---

[14] See also *Hughes* (affirming a district court's judgment in favor of the carrier that its limitation of liability was valid because the shipper received "a fair opportunity to choose between alternative levels of coverage." Id. at 1421. On a bench trial, the court found

> that the [plaintiffs] (1) discussed the different types of liability coverage with [the carrier's personnel]; (2) chose the Gold Umbrella full value protection with a replacement value limitation of $3.00 per pound; (3) were given informational pamphlets explaining the liability limitations associated with the different rates a shipper could declare for his goods; (4) had opportunities to call [the carrier] about any misunderstanding they had about their liability coverage; (5) signed the "Order for Service" form voluntarily declaring the valuation rate to be $3.00 per pound; and (6) were seasoned shippers of goods

*Id.* at 1420–21.

26

The Seventh Circuit affirmed the district court's grant of summary judgment for the shipper because the bill of lading, which purportedly incorporated the carrier's tariff without even referring the tariff "by number or any other identifier," was insufficient to limit liability. As the court explained:

> if we read the contract between [the shipper] and [the carrier] as the functional equivalent of a rate tariff, again there is no reference to [the carrier's] rules tariff, by number or any other identifier. [The shipper] would not have had any reason to track down [the carrier's] standard terms, and it has long been established—quite apart from the language of [the carrier's] "tariff"—that actual notice is necessary for a limitation of liability to be enforced.

*Tempel Steel Corp.*, 211 F.3d at 1030. "Having agreed to through transport in order to obtain the business, and having failed to offer [the shipper] a price schedule that linked rates to liability for loss, [the carrier] must accept the legal consequences." *Id.* at 1031. Even if constructive notice had sufficed, carriers "may not * * * simply declare that they have no liability—for a value of $0 rarely will be 'reasonable under the circumstances surrounding the transportation.'" *Id.* at 1031. See, *e.g.*, *Hisense USA Corp. v. Cent. Transp., LLC*, 2015 WL 4692460, at *1–2, *5 (N.D. Ill. Aug. 6, 2015) (denying summary judgment to carrier enforcing its liability limitation because the shipper lacked actual notice; although the bill of lading properly incorporated the specific tariff provision, the bill "ma[de] no mention of a liability limitation and contain[ed] no blank in which to declare value" and the language that "the shipment was 'released to the value at which the lowest freight charges apply'" was insufficient to show the shipper's "knowledge of the varying rates and liability limitations contained in the tariff").

In this case, YRC cannot establish that Cessna as nominal shipper or P&WCL as shipper indisputably were on actual notice of the choice of liability levels. Recall that the Bill of Lading provides in relevant part that the Jet Engines were "[r]eceived subject to individually determined rates or written contracts that have been agreed on in writing between the carrier and the shipper,

27

if applicable, otherwise to rates, classifications and rules that have been established by the carrier and are available to the shipper on request." [183-2 (Ex. 1, YRC Bill of Lading).]   The Bill of Lading does not even remotely inform the shipper which, if any, tariff applied to the Jet Engines, much less which item within YRC's Tariff would be applicable here.[15]  Just as in *Tempel*, "there is no reference to [YRC's] rules tariff, by number or any other identifier," leaving Cessna and P&WCL with no "reason to track down [the carrier's] standard terms." 211 F.3d at 1030; see also *H. Kramer & Co. v. CDN Logistics, Inc.*, 2014 WL 3397161, at *3–4 (N.D. Ill. July 11, 2014) (refusing to dismiss under Rule 12(b)(6) enforcement of limitation in bill of lading absent specific reference to defendant's tariff because "[t]he critical inquiry under *Tempel* is whether the shipper has 'actual notice," and that question cannot be answered merely by looking to whether the bill of lading refers to a tariff.")

For that same reason, it is doubtful that the Bill of Lading put P&WCL and Cessna on notice that the Schneider Transportation Schedule applies.  The Bill of Lading makes no mention of the Schneider Transportation Schedule except to the extent that it sets the goods subject to "written contracts."   However, there are myriad other, independent reasons that YRC cannot prevail as a matter of law on its argument that the Schneider Transportation Schedule includes a valid limitation of liability as a matter of law.

### B.    Schneider Transportation Schedule

The stronger basis for YRC's motion for summary judgment and opposition to Starr's cross-motion is YRC's contention that the Schneider Transportation Schedule was incorporated into the Bill of Lading, and that the Schneider contract features an enforceable limitation of liability

---

[15] Equally problematically, the Bill of Lading makes no mention of the Schneider Transportation Schedule. For the sake of clarity, however, the Court will address the arguments that Starr raises with respect to the Bill of Lading's incorporation of YRC's Tariff, and reserve Starr's arguments about the Schneider Transportation Schedule for Part B.

for the damage to the Jet Engines. [215 (YRC Opp. to Starr MSJ) at 16.] As noted above, Starr primarily takes the position that the Schneider Transportation Schedule did not offer full liability, nor did it offer a choice of liability rates. And, specific to the Schneider Transportation Schedule, Starr also argues that Cessna and P&WCL are bound by the Transportation Schedule because "there was no privity of contract between them and YRC." [203-1 (Starr MSJ Br.) at 25.]

Drawing on the principles articulated in *Nipponkoa* and *Hughes*, the Court disagrees with YRC that it is entitled to judgment as a matter of law on the limitation of liability in the Schneider Transportation schedule based on several genuine disputes of fact.

### 1. *Hughes* Choice of Liability Levels

First and primarily, the record is unclear on whether YRC gave the shipper "a reasonable opportunity to choose between two or more levels of liability" to satisfy the third *Hughes* requirement. The Schneider Transportation Schedule provides, among other things, that:

> The value of all used machinery or equipment will be the lesser of Fifty Cents ($0.50 USD) per pound or the current depreciated value on date of shipment, subject to a maximum liability of Twenty Thousand U.S. Dollars ($20,000.00 USD) per shipment. SERVICE PROVIDER shall otherwise provide liability for a "mixed load" containing both used machinery and other commodities subject to a maximum of *** One Hundred Thousand U.S. Dollars ($***100,000.00 USD)."

As in *Nipponkoa*, YRC has not carried its burden of showing that it offered "a second option for a rate." *Id.* at 783–84. In fact, on its face, the Schneider Transportation Schedule offers the shipper a single rate, *i.e.*, the lesser of $.50 per pound or the current depreciated value, for single loads (or a mixed load rate to be "otherwise provid[ed]" by YRC). Although YRC argues that it "obtained Pratt & Whitney's agreement as to its choice of liability levels in entering into the Transportation Schedule and offered it a reasonable opportunity to choose between two or more levels of liability in entering that agreement," [215 (YRC Opp. to Starr MSJ at 16], YRC fails to specify what, if any, second rate it offered.

It is no answer to say that P&WC was offered a choice of rates because the Schneider Transportation Agreement was negotiated against the backdrop of YRC's Tariff. Although this *might* be a valid argument, the record is insufficiently developed on this score: the Court cannot say that Item 780 offered a different rate than the $0.50 and $100,000 maximum liability laid out in the Schneider Transportation Schedule. See *Nipponkoa*, 687 F.3d at 782.

The Schneider Transportation Schedule also presents several other ambiguities that preclude judgment as a matter of law. As noted above, YRC directs the Court to the rates for "used equipment" under the contract, but the Court cannot conclude that those rates apply because the Schneider Transportation Schedule provides different rates for "LTL—Less than Truckload" shipments which appear equally applicable to the case. Per the agreement, "effective April 2, 2007," "NMFC Item 120800 is to be rated at FAK 60," and under the "FAK Structure" shipments for class "150+" are billed for "actual." [183-22 (Ex. 22, Schneider Transportation Schedule) at 16.] That is to say nothing of a third candidate for the "rate" applicable to these goods—the NMFC Number—on the Bill of Lading into which the Schneider Transportation Schedule is incorporated.[16] So, even assuming YRC offered more than one option for a rate on these goods,

---

[16] Specifically, the Bill of Lading also lists another potential candidate for YRC's rate: the NMFC Classification Number. Namely, the Bill of Lading also provides that the "NMFC Item number" for "Aircraft Engines CG0717" and "CG0005" is "12080004," "Class 85." [183-2 (YRC Bill of Lading).] The parties dispute what role the NMFC Classification Number plays in rate setting. Relying on testimony from YRC, Starr asserts that "YRC relies upon the NMFC and other information provided on bills of lading to rate shipments" [216 (YRC Resp. to Starr SOF) at pg. 18, ¶ 42.] See id. (YRC admits "that for certain shipments YRC may use the NMFC and information provided on a bill of lading to determine the freight rates." (citing ASOF ¶ 13; Carpenter Dep. 33:17–24, 34:1n. 1–21)). However, neither party says conclusively how the Court should determine what role the NMFC Number, clearly indicated on the Bill of Lading, plays here. Starr's expert report testified that the "most applicable provisions for these products is Item 120800," class 150, see [189-4 (Starr Expert Report) at 7–8] whereas the BOL refers to class 85. See [183-2 (YRC BOL).] YRC, for its part, objects to Starr's expert report as inadmissible because it is unsworn, and on the merits asserts that the NMFC classification is irrelevant to this claim as the Schneider Transportation Schedule "governs all transportation services and expressly excludes the application of the NMFC" [216 (YRC Resp. to Starr SOF) at pg. 19–20, ¶ 43]. In other words, there is no way for the Court

the Court could not conclusively state *which* rate applied—the "$0.50" rate assigned to used machinery or the provision of "actual value" for "less than truckload" shipments. See, *e.g.*, *Frontier Supply Chain Sols., Inc. v. Streamline Transp. Sols., LLC*, 2014 WL 3705349, at *3 (N.D. Ill. July 25, 2014) (observing that given conflicting rates for liability, "the limited liability for the carrier there might, but does not necessarily, conflict with the unlimited liability for the carrier set forth in the load confirmation sheet dated a month earlier" such that the court could not grant judgment on the pleadings). Without a clear picture of which rate applies, the Court also has no recourse to evaluate the parties' competing views of whether those rates were reasonable. See 49 U.S.C. § 14706(c)(1)(A) (which requires the rates to "reasonable under the circumstances surrounding the transportation"). See [203-1 (Starr MSJ Br.) at 16.]

## 2. Intermediary

Even putting aside those issues, a genuine dispute of fact exists as to whether Schneider Logistics Inc. is the shipper's (or nominal shipper's) intermediary. DHL, which prepared the Bill of Lading for P&WCL, was undoubtedly the intermediary of P&WCL. However, two gaps in the chain preclude this Court from finding that the Bill of Lading conclusively incorporated the *Schneider* Transportation Schedule. First, the Bill of Lading does not reference the Schneider Transportation Schedule, so it is not clear that DHL explicitly agreed to incorporate the contract between DHL & Schneider into this shipment.

---

to decide whether the rate set out in the NMFC applies (and for that matter, which rate), or whether YRC's Tariff 100, Item 780 applies.

YRC tries to short-circuit this issue by arguing that its Tariff sets rates "in lieu" of the NMFC. [215 (YRC Opp. to Starr MSJ) at 19] YRC states that it is "neither constrained nor compelled to use or abide by [the NMFC] provisions;" as YRC always has "the free and unrestrained right of independent action." See ASOF ¶ 14, Copy of NMFC Series 100-AN (2/8/14), p. 1. [216 (YRC Resp. to Starr SOF) at pg. 18, ¶ 42.] The Court is not persuaded: the Court has already explained why it is unclear whether the YRC Tariff was incorporated into the Bill of Lading.

Second, the record does not sufficiently show that the Schneider Transportation Schedule bound the shipper, P&WCL, or nominal shipper, Cessna. To begin, YRC invites the Court to conclude that Schneider Transportation Schedule was automatically triggered when YRC and Cessna signed the Bill of Lading. Starr vigorously disputes the characterization of P&WC and P&WCL as one entity and the corollary of Schneider as *P&WCL*'s intermediary. The agreement signed by Schneider refers specifically to P&WC, not P&WCL. Although the agreement also refers to P&WC's "divisions" and "subsidiaries" as "customers" for purposes of the agreement, the record is unclear whether that contemplates P&WCL. On the one hand, P&WCL is closely tied to P&WC, holding a majority of P&WCL's voting units under the two entities' "Limited Partnership Agreement." See [ASOF ¶ 31; Exh. 45, Limited Partnership Agreement at § 4.2.] On the other hand, several other subsidiaries of P&WC were subject to separate agreements, containing separate liability provisions, with YRC. Namely, "P&WC subsidiaries, Hamilton Sundstrand, Otis Elevator Company and Carrier Air Conditioning, ("Carrier") each had their own agreements with YRC, which were negotiated separately by Schneider and YRC." [216 (YRC Resp. to Starr SOF) at ¶ 56.] (admitting fact). The Court agrees with Starr that reading the terms "divisions/subsidiaries" to include P&WCL would render the contract ambiguous because it "would also bind any true 'subsidiary or division' of P&WC" without regard to the fact that some subsidiaries have their own contracts with YRC. See [203-1 (Starr MSJ Br.) at 29.] [17]

Equally troubling, the parties provide little to no explanation of how to construe the phrase "divisions and subsidiaries" in the contract. Paradoxically, Starr asserts, with little to no legal

---

[17] YRC's argument that Starr's construction of the contract renders the Schneider Transportation Schedule ambiguous because "no subsidiaries or divisions were specified." The Court agrees that the contract has to apply to *some* subsidiaries. [215 (YRC Opp. to Starr MSJ) at 25] But YRC's argument is unavailing because the contention that the phrase has to mean *something* is not the equivalent of proving that the phrase conclusively encompasses P&WCL.

support, that the Court should evaluate the contract under Wisconsin law because of a choice of law provision in the contract but goes on to state that Canadian Law dictates the terms of "divisions" and "subsidiaries." The trouble is, even assuming that Canadian Law applies to the terms of the contract, neither party enlightens the Court whether it must follow Wisconsin or Canadian law to determine whether a fact finder, or this court, should determine the scope of the contract. The parties' failure to illuminate a pathway for determining how to construe the contract precludes this Court from determining that Schneider is an "intermediary" in relation to P&WCL as a matter of law.

In sum, having found that the Court cannot determine on this record (1) that the Schneider Transportation Contract offered the shipper a choice of liability rates, (2) which rate applies to the goods at issue in this case, and (3) whether Schneider is P&WCL's intermediary such that P&WCL was bound by the rates set in the Schneider Contract, the Court rejects YRC's argument that it is entitled to summary judgment.

### C.    Full Liability

The Court turns now to the remaining arguments in support of summary Starr's motion for summary judgment [203, 203-1.] In support of its asserted entitlement to recover the full value of repairs, Starr argues that YRC refused to offer "full liability" as required by the Carmack Amendment. Starr asserts that YRC has "consciously ignored its duty to offer full liability to P&WC, P&WCL or CESSNA." [203-1 (Starr MSJ Br.) at 11]. Furthermore, according tto Starr, "unless motor carriers offer full liability, they are not entitled to limit their liability below the default posture of full liability under the Carmack Amendment." [*Id.* at 12.] YRC objects, arguing that Starr cannot cite any holding from the Seventh Circuit that a carrier is required to offer full liability.

The Court agrees with YRC that Starr is not entitled to the full repair costs as a matter of law because no court has held that the Carmack Amendment *requires* YRC to offer a shipper the full value of the engines as one of the two or more options needed to create an enforceable limitation of liability provision. Starr's reliance on *Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.,* 996 F.2d 874 (7th Cir. 1993), for the proposition that YRC must offer the actual value of the goods is misplaced. *Tokio Marine* involved the loss of goods stolen in the course of transit across several carriers. *Id.* at 875–76, Plaintiffs alleged a Carmack Amendment violation against the various carriers, which included both a trucking and railroad companies. *Id.* at 876. The Seventh Circuit took up a limited issue on interlocutory appeal: "the continued viability of applying the Carmack Amendment, 49 U.S.C. § 11707, to common carriers providing trailer on flatcar (TOFC) and container on flatcar (COFC) services." *Id*. Reversing the district court, the Seventh Circuit reasoned that "Congress did not confer on the ICC unlimited authority to deregulate but rather stated certain specific limitations." *Id.* at 877. "[O]ne such limitation," was the carrier's "obligation to provide contractual terms for liability and claims consistent with the provisions of section 11707." *Id.* at 877. Although the precise meaning of Section 11707 was not at issue, the court of appeals did provide the following observation:

> In § 10505(e), we deem it clear that Congress intended that carriers still have the obligation of offering full value rates to shippers. Nothing within § 10505(e) is intended to repeal § 11707(a)(1) requiring liability of all carriers over whose line or route the property is transported. However, consistent with the reasons for deregulation, Congress gave carriers increased latitude in offering "alternative terms" to shippers. Thus, since deregulation, rail carriers still must offer full value rates, but they may offer alternative terms as well.

*Id.* at 879. And the court answered in the "negative" the "question posed to us—whether deregulation by the ICC of TOFC/COFC service under the Staggers Rail Act exempts common carriers from liability under the Carmack Amendment." *Id*. at 880.

Although the phrase "Congress intended that carriers still have the obligation of offering full value rates to shippers" appears to support Starr's view on first blush, Starr has not persuaded this Court that the Carmack Amendment requires a carrier to offer full liability as one of the options in a valid limitation of liability provision for four reasons.

First, the meaning of "choice of liability" was not squarely at issue in *Tokio Marine*; rather the sole question posed to the Court on interlocutory appeal was "whether deregulation by the ICC of TOFC/COFC service under the Staggers Rail Act exempts common carriers from liability under the Carmack Amendment." 996 F.2d at 880.

Second, this Court could not find, nor have the parties cited, another decision of the Seventh Circuit that stands for the proposition that a carrier must offer full liability as an option under an enforceable limitation of liability provision under *Hughes* and its progeny. *Cf. Siemens Transformadores S.A. de C.V. v. Soo Line R. Co.*, 2012 WL 774937, at *4 (N.D. Ill. Mar. 7, 2012). That is unsurprising, as Starr's version does not appear consistent with the plain language of the Carmack Amendment, which only requires carriers strike a deal that would "be reasonable under the circumstances surrounding the transportation.'" 49 U.S.C. § 14706(c)(1)(A)), or the *Hughes* test's requirement that carriers "give the shipper a reasonable opportunity to choose between two or more levels of liability." 829 F.2d at 1415–16.

Third, it does not appear that the circuits to have reached the issue have concluded that a carrier is required to offer full liability. To the contrary, the cases cited by Starr suggest that the carrier must only offer a choice of options, not any specific option, to fulfill the requirements of the statute. For example, the Ninth Circuit enforced a bill of lading where the plaintiff was given an option to limit liability under the third *Hughes* step over the plaintiff's objection that that the bill of lading was inconsistent with the Carmack Amendment because it did not "list the actual

value of the good as the default rate." See *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1100–01 (9th Cir. 2011) (concluding the *Hughes* test was satisfied where bill of lading stated defendant's liability was "limit to $50 or $.50 per pound in the absence of a higher declared value" and stating further "[h]ere the bill of lading expressly limits [the defendant]'s liability in the absence of a higher declared value. By signing the bill without listing a declared value, the parties agreed to the limitation of liability"). To be sure, in some of the cited cases the carrier did in fact offer full value, but the courts of appeals have not even addressed, much less held, that the carrier must offer full value liability. See *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778–79 (5th Cir. 2003) (addressing the "validity of the $70,000 limitation of liability" and finding all four-Hughes elements satisfied, including "the reasonable opportunity to choose among two levels of liability"); *Werner Enterprises, Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1328 (11th Cir. 2009) (*Hughes* test satisfied where contract provided two options, a maximum of "Two Hundred Thousand Dollars ($200,000) per truckload shipment" or "a higher degree of liability is specifically assumed in writing by an authorized representative of Carrier").

Fourth, and finally, to test the proposition that *Tokio Marine* may more accurately reflect the law of liability limitation under the Carmack Amendment than *Hughes*, the Court traced the third step of the *Hughes* test—requiring the carrier to "give the shipper a reasonable opportunity to choose between two or more levels of liability"—back to its apparent origin. *Hughes* cited a First Circuit decision, *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir. 1978), as authority for the four steps that comprise the settled requirements that "a carrier must take to limit its liability under the Carmack Amendment." 829 F.2d at 1415-16. *Anton*, 591 F.2d at 108, phrased the third step as requiring a "fair opportunity to choose between higher and lower liability by paying a correspondingly greater or lesser charge," citing *New York, N.H. & H. R.R. Co. v.*

*Nothnagle*, 346 U.S. 128, 135 (1953). In *Nothnagle*, the Supreme Court stated the rule as follows: "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained," 346 U.S. at 135 (citing *Boston & Maine R. Co. v. Piper*, 246 U.S. 439, 444-45 (1918), and *Union Pacific R. Co. v. Burke*, 255 U.S. 317, 321-23 (1921)). And going all the way back to *Burke*, citing *Piper*—and, indeed, even back to *Hart v. Pennsylvania Railroad Co.*, 112 U.S. 331 (1884), which predated the Carmack Amendment by twenty-two years—"it has been declared to be settled federal law that, if a common carrier gives to a shipper the choice of two rates, the lower of them conditioned upon his agreeing to a stipulated valuation of his property in case of loss, even by the carrier's negligence, if the shipper makes such a choice understandingly and freely, and names his valuation, he cannot thereafter recover more than the value which he thus places upon his property." *Burke*, 255 U.S. at 321 (citing *Piper* and *Hart*); see also *Piper*, 246 U.S. at 443-44 ("In the cases in which the recovery for the lesser valuation has been affirmed, the shipper was offered an opportunity to recover a greater sum than the declared value upon paying a higher rate to the carrier"). In short, nowhere in this long line of cases dating back more than a century has the Supreme Court or the Seventh Circuit stated that a shipper is obligated under the Carmack Amendment (or the pre-existing common law) to offer full value as one of the options in a valid limitation of liability provision.[18]

---

[18] Presumably, if a shipper desires the protection of full value for its shipment and a given carrier does not include full value among the two or more "levels of liability" in its service menu, the shipper can move on to a different participant in the shipping industry and the market will provide an option where the cost of the service requested matches the risk borne by both sides of the transaction all the way up to full value (or more).

## IV.   Conclusion

In sum, there are too many disputed issues to convince this Court to conclude as a matter of law that YRC has fulfilled its obligations under the Carmack Amendment, either through its Bill of Lading or the Schneider Transportation Schedule.  As Starr points out, it is not clear which rates were offered to the shipper under either the Tariff or the Schneider Transportation Schedule, and even then, whether YRC laid out a choice.  Likewise, it is unclear that the shipper was actually on notice of the Tariff, or that Schneider Logistics functioned as an intermediary to YRC. Accordingly, the Court denies YRC's motion for summary judgment [181, 182.]  Finally, the Court also denies Starr's motion for summary judgment [203, 203-1] based on the absence of authority for the proposition that YRC was required to offer full liability as one of the two or more options in a valid and enforceable limitation of liability provision.  The parties are directed to confer in regard to whether they wish to (a) explore settlement on their own, (b) explore settlement with the assistance of Magistrate Judge Gilbert, or (c) request a trial date.  A joint status report providing the parties' views on these topics and any others is due no later than October 28, 2022.

Dated: September 29, 2022

Robert M. Dow, Jr.
United States District Judge